519 So.2d 319 (1988)
Dr. Gary Stephen KEY, Plaintiff-Appellee,
v.
Gayle Ann Hager KEY, Defendant-Appellant.
No. 19237-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1988.
*320 Tyler & Johnson by D.G. Tyler, for defendant-appellant.
Kennedy, Goodman & Donovan by Robert J. Donovan, Jr., for plaintiff-appellee.
Before MARVIN, NORRIS and LINDSAY, JJ.
MARVIN, Judge.
In this action to change joint custody of children, the mother appeals a judgment granting the father sole custody of the two children, terminating the father's support obligations, and assessing each party one-half the cost of litigation and future counseling.
Notwithstanding the father's contention that the appeal is moot, we reach the merits of the case. We amend to decree joint custody with the father as domiciliary parent. We affirm the amended judgment and remand to allow the litigants to detail and implement a joint custody plan under supervision of the trial court.

PROCEDURAL HISTORY; MOOTNESS OF APPEAL
The marriage of the father and mother in 1975 produced two children; a daughter, Kellie, in 1977 and a son, Stephen, in 1979. The parties legally separated in 1983 and joint custody was agreed on and decreed with the mother being the domiciliary parent. A divorce in 1984 continued the joint custody decree and support order.
A judgment in March 1986 reduced the father's monthly support obligation from $600 to $525 per child and added these provisions to the joint custody decree:
Either parent may remove residence from the Parish of Caddo. At least thirty (30) days prior to such removal, the parent changing residence shall request a modification of this plan from the remaining parent ... If no agreement is reached, the party changing residence shall request a modification from the court.
The residence of the children shall not be removed at any time from Caddo Parish without an appropriate order of this court.
About a month later and alleging his knowledge of the mother's intent to marry a resident of, and move to, Ohio, the father sought to modify joint custody and have himself decreed to be residential custodian. After a two-day hearing, the trial court rendered a judgment on August 22, 1986, that was signed on February 6, 1987. This judgment rejected the father's demand to modify joint custody, but stated:

*321 provided, however, that should [the mother] marry any person who lives outside Caddo Parish ... then upon the happening of that event, [the father] will be and he is at that time awarded sole custody

. . . . .
The mother had married her Ohio finance in December 1986 after that judgment was rendered but before it was signed.
On January 29, 1987, the father sought sole custody on allegations about the mother's second marriage. The only evidence adduced at a brief hearing on February 13, 1987, was about the mother's second marriage. Obviously relying also on evidence adduced in the August 1986 hearing, the trial court rendered judgment on February 13, which was signed on February 19, 1987, and which decreed sole custody to the father and visitation privileges to the mother.
The mother's motion and order for appeal, filed and signed on February 27, 1987, mentions only the February 6 and not the February 19 judgment. The father seeks here to dismiss the appeal of the February 6 judgment on the grounds that it was superceded and rendered moot by the February 19 judgment. Because of the described circumstances and the jurisprudential policy favoring appeals, we do not agree with the father.
As a general rule, judgments must be certain and not be based on any contingency. Pepe v. Tournage, 128 So.2d 56 (La. App. 1st Cir.1961). See also 49 C.J.S. § 73. The procedural history of this case explains the reasons for and supports the policy requiring that judgments be certain. The first judgment, in our opinion, is improper in that, at the very least, it implies that a second judgment following the mother's remarriage is perhaps unnecessary and merely redundant. To compound the procedural anomaly, the mother had remarried even before the February 6 judgment was signed and after the father sought sole custody.
La.CCP Art. 2161 governs the dismissal of appeals for "irregularities" that are "imputable to the appellant." We cannot hold the appellant responsible because the procedural anomaly is largely attributable to the unfortunate wording and the timing of the signing of the first judgment. See Gremillion v. Rinaudo, 240 So.2d 237 (La. App. 1st Cir.1970).
The February 19 judgment relates to the February 6 judgment and cannot be based solely upon the evidence presented at the February 13 hearing. The January 29, 1987, rule filed by the father and the hearing of that rule in February are merely extensions of the first rule and the first hearing in August 1986. We maintain the appeal because the two February 1987 judgments are so interrelated and merged. See Smith v. Smith, 398 So.2d 549 (La. App. 1st Cir.1979), writ denied. We shall consider, as the trial court did, the entire record, which was compiled in August 1986 and in February 1987, in this appeal. See Garrett v. Garrett, 324 So.2d 494 (La.App. 2d Cir.1975).

EVIDENTIARY FACTS
The father is a dental surgeon in Shreveport. The mother had not been employed other than as a homemaker and nurturing parent until after the 1983 separation when she worked part-time for a brief period for a Shreveport law firm.
The evidence taken in August 1986 revealed the family and individual circumstances before and after the husband and wife separated.
Each party alleged and attempted to prove the other unfit because of adulterous conduct and alcohol abuse. Ultimately, however, the trial court found that both the mother (in Ohio) and the father (in Louisiana) would provide good homes for the children, but concluded the stress and uncertainties resulting from a move to Ohio would not be in the best interest of the children. At the time of the hearing Kellie was about nine years old and Stephen was seven years old. Both the mother and father were planning a marriage to another in August and the court heard testimony concerning their respective plans.
Three experts in the area of psychology and family counseling testified. Dr. *322 Staats, a psychologist, was appointed by the court to evaluate the two children, the mother and father, and their respective fiances, who were Mr. Setzer and Ms. McCormick. As part of the evaluation, Dr. Staats administered psychological tests of the adults and the children.
Kellie was found to be extremely well adjusted while Stephen's adjustment to the parents' separation was average. Kellie was thought to be better able to adjust to living with a parent of the opposite sex than Stephen. Dr. Staats noted Kellie's desire to remain with her mother, that she identified more with her mother, and that it would be in her best interest to remain with her mother. Stephen desired to remain in Shreveport with his father. Dr. Staats believed that it would be in Stephen's best interest to do so.
Dr. Staats found the father to be compulsive and manipulative. He believed the father's personality evaluation indicated "whitewashing" or distortion of circumstances by the father. Dr. Staats found the mother to be impulsive and overly emotional in her discipline of the children.
Each prospective spouse was found to be well-adjusted and a suitable step-parent candidate. Mr. Setzer is a divorced executive who holds a MBA and is a graduate of West Point. He is the custodial parent of two daughters, ages 10 and 12. The Setzer family formerly resided in Shreveport where they were neighbors of the litigants.
Ms. McCormick is a divorced dental assistant who worked at the father's office for about two years during 1981-83.
Finding no psychopathology in any of the parties, Dr. Staats concluded his report as follows:
All in all, either set of parents could provide an adequate environment for the children, and neither home is vastly superior to the other. In terms of weighing the balance to the minute degree, this examiner favors the children remaining in Shreveport in the home of their father,... with liberal visitation privileges granted to the Setzer family.
Dr. Rausch, a psychologist and the father's acquaintance and fellow church member, favored custody for the father because of possible detriment a move to Ohio could cause the children. He found nothing detrimental about the environment the mother had provided after the 1983 separation and foresaw no difficulty with the children staying with the mother in Shreveport. Dr. Rausch, agreeing with Dr. Staats, believed that Kellie would better adjust to living with a parent of the opposite sex than Stephen would. Dr. Rausch was also concerned that an award of custody to the mother would require adjustment to the presence of Mr. Setzer's two adolescent daughters, whereas Ms. McCormick has no children of her own. The stress of adjusting to the Setzer home in Ohio would not be in the children's best interest, according to Dr. Rausch.
The third expert, Dr. Minniear, a Ph.D. and family counselor, favored the children staying with the mother. Unlike the other two experts, Dr. Minniear believed the stress of moving to another state could be of less significance than the comparative stress involved in a change of "primary parents." He believed the children viewed their mother, with whom they had lived since the separation, as their primary parent.
Dr. Minniear had been counseling the mother since December 1982. He had also met with the father and the children as early as 1983. The other two experts did not counsel with the family for such a period.
The father also called friends, business associates, and fellow church members to establish that he was of good character and a good father. These witnesses supported the father's denial of alcohol abuse which the mother had alleged against the father. The father also called witnesses to rebut the allegation that he and Ms. McCormick were having an adulterous affair while he was still married to and living with the mother and while Ms. McCormick was married to and living with her husband.
The father's effort to prove the mother unworthy centered around the mother's admitted adulterous affair with another and *323 her pre-marital sexual relationship with Mr. Setzer. The mother admitted having an adulterous affair with another from March 1983 to November 1983. The father obtained the divorce based on this affair.
The mother also admitted sleeping in the same bedroom with Mr. Setzer, both in her home in Shreveport and his home in Ohio, while the two children were present in the homes.
The father's witnesses testified that he and Ms. McCormick regularly attend church with the two children and that the father is actively involved in the son's athletic pursuits.
While the father and Ms. McCormick admitted having had pre-marital sexual relations, they denied such conduct while the children were in the home.
Several friends and neighbors of the mother testified that she was a good mother-homemaker who provided a stable home. Former teachers of the two children testified about the mother's involvement in the school activities and studies of the children. The maternal grandparents from Ohio testified their daughter was a good mother and expressed that they were anxious for the children and their mother to return to Ohio where the mother had been reared.
A former neighbor stated that the father was normally a good neighbor, but that he occasionally drank excessively and became ill-mannered. She stated that her teenage daughter had complained of the father's behavior on a particular occasion when the father was drinking.
Ms. McCormick's former husband also testified to his suspicion and facts on which it was founded that his former wife was having an affair with the father during the time she was employed at the father's dental office. He also testified that the father had improperly dispensed prescription drugs to Ms. McCormick who was also then allegedly purchasing illegal drugs. Ms. McCormick was divorced in the fall of 1983.
One former employee at the father's dental office testified that Ms. McCormick and the father were having an affair in the fall of 1983 while both were still married.
Another former employee of the father stated her belief that there was no improper relationship between the father and Ms. McCormick during the fall of 1983. Ms. McCormick and her former roommate, Ms. Grafton, testified that Ms. McCormick's husband was abusive and threatening toward Ms. McCormick and that Ms. McCormick never used illegal drugs.

SOLE CUSTODY VS. JOINT CUSTODY
At the outset, we note that the decision of the trial court to grant the father sole custody did not modify or reverse a "considered decree" of joint custody. The earlier judgments decreed the joint custody plan that was agreed to by the mother and father. The issue of custody was not previously contested. We therefore do not apply the change of circumstances rule and the heavy burden of proof rule which were reaffirmed by the supreme court in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Dungan v. Dungan, 499 So.2d 149 (La. App. 2d Cir.1986).
There is also no presumption that joint custody is in the best interest of the children when one of the parents moves out of the state.[1] Both parents were before the trial court on relatively equal terms and the applicable and proper test was the best interest of the children. CC Art. 146; Dungan, supra.
CC Art. 146K removes or negates any presumption of joint custody. The absence of the presumption does not, however, direct that sole custody is mandated. *324 Here the mother had been an acceptable residential custodian of the two children for almost three years following the separation. The weight of the expert testimony favored the continuation of the children's domicile in Shreveport. Whether the best interest of the children, on the one hand, favors sole custody and, on the other hand, favors the children remaining in Shreveport, however, are two separate and distinct questions. See Sambola v. Sambola, 493 So.2d 206 (La.App. 5th Cir.1986).
The trial court explained its belief that the best interest of the children would be served by their remaining in Shreveport. We cannot say that the court's holding in that respect was a clear abuse of discretion. The court's removal of the two children from the stable environment which the mother had provided for nearly three years was not a clear abuse of discretion because the children, unfortunately, were destined for a significant change in environment whether in Shreveport or in Ohio.
Notwithstanding our holding in the above respect, we cannot agree that the circumstances mandate that it is in the best interest of the children to change joint custody to sole custody. The children had adjusted to joint custody during the three years following the separation of their parents. The experts implied that the most favorable custodial situation in the children's best interest would be with the mother in Shreveport. The next best situation, according to the weight of the experts, would be with the father in Shreveport. No expert suggested sole custody with the father in Shreveport would be in the children's best interest. No expert suggested a complete severance of the joint custodial rights the mother had been exercising.
Under the described circumstances, we deem that the best interest of the children would be served by continuing, even though to a lesser degree, some joint custodial rights for the mother. These parents and children are not nearly as polarized and litigious as the ones in Turner v. Turner, 455 So.2d 1374 (La.1984). Compare Osborne v. McCoy, 485 So.2d 150 (La. App. 2d Cir.1986); Carroway v. Carroway, 441 So.2d 494 (La.App. 2d Cir.1983). See Sambola, supra.
We find no inequity or abuse of discretion in the trial court's assessment of costs and the expense of future counseling. The requirement of future counseling should be made for a definite time. See Pepe, supra. See also Johnson v. Hendrix Mfg. Co., Inc., 475 So.2d 103, 107 (La.App. 2d Cir. 1985); DB Orban Co. v. Lakco Pipe & Supply, Inc., 496 So.2d 1382, 1385 (La.App. 3d Cir.1986). From the community property settlement after separation, the mother received cash and liquid assets, including promissory notes which are paid to her in 60 monthly installments totaling about $2,000 a month beginning October 1, 1984.

DECREE
We amend the judgment to change the custody award to the father from sole custody to joint custody, with him being the domiciliary parent, and remand to the trial court to allow the litigants to detail and implement a plan of joint custody subject to the supervision of the trial court. On remand, the trial court shall decree the time during which counseling is required. Costs of the appeal are assessed one-half to each litigant.
AMENDED IN PART AND AFFIRMED AND REMANDED.
NOTES
[1] The father stresses Civil Code Art. 146, paragraph K which reads as follows:

Notwithstanding any provisions of this Article to the contrary, when an award of joint custody has been made to parents domiciled in the state of Louisiana and either parent changes his or her domicile to another state, the presumption that joint custody is in the best interest of a child shall cease to exist. In such case, either parent may petition for and the court after a contradictory hearing may modify the joint custody award or award sole custody of the child to either parent in accordance with the best interest of the child. Nothing contained herein shall prohibit the parents from continuing joint custody by agreement. (Emphasis supplied.)